UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| UNITED STATES OF AMERICA | * | CRIMINAL ACTION |
|---|---|---|
| VERSUS | * | MAG. NO. 10-198 LM |
| WILLIAM E. GLOVER & | * | |
| CHARLES E. SINGLETARY | * | |

RULING ON MOTION TO SUPPRESS (REC. DOC. 10)

Before the court is a joint motion to suppress filed by defendants Glover and Singletary for which an evidentiary hearing was held on October 20, 2010 before the undersigned Magistrate Judge.

Appearances:  Spiro G. Latsis, Assistant United States Attorney for the government

Cynthia Cimino, Assistant Federal Public Defender for defendant Glover

Mark Joseph Mansfield, Esq. for defendant Singletary

FINDING OF FACTS

The following testimony was offered by Brian Gourgues, Agent for the U.S. Fish & Wildlife Service:

At the time of the challenged incident with Singletary and Glover, Agent Gourgues was employed with the U.S. Fish & Wildlife Service for two years in the Uniformed Refuge Division. He had previously served for seven years with the National Park Service in a similar position.(T.14) Gourgues was trained in law enforcement and received yearly refresher courses from the agency.(T.

16).

On February 6th, 2010 at approximately 8:15 a.m., Agent Gourgues was wearing a uniform variation consisting of a camouflage uniform with subdued badges coupled with a gold government issued badge on his a duty belt. He was carrying a sidearm, handcuffs, two magazines, a baton and a semi-automatic assault rifle, carried on a sling which was positioned in front of him (T. 6-7, 23). He was about 1/3 of a mile inside the Bogue Chitto National Wildlife Refuge in St. Tammany Parish, Louisiana, when he observed two individuals, later identified as defendants Charles Singletary and William Glover, ride into the refuge on an all-terrain vehicle (ATV). The agent observed the individuals near an illegal tripod corn feeder in a small clearing, measuring approximately 30 yards across. (T. 9, 30, 48). After a few moments, he drew his rifle, then announced himself as a police officer. He ordered the defendants to kneel on the ground and place their hands behind their head. The defendants complied.(T. 8, 10). Agent Gourgues indicated that the total time that he actually pointed the rifle at the defendants was less than one minute. (T. 24). The agent removed his handcuffs off his duty belt and placed them on Charles Singletary. (T. 11). With his rifle in a sling across his chest, the agent then proceeded to pat the defendants down, searching for weapons (T. 11, 17). He seized a knife from each of them and obtained their identification. (T. 11-12). Noticing that defendant Singletary smelled strongly of marijuana, the agent asked him if he had marijuana on him. Singletary replied that he did. Upon being asked where he was carrying the marijuana, Singletary indicated it was in his front pocket and the agent seized it. (T. 17). The agent denied telling Singletary that he was under arrest and reported that he "blatantly" told him that he was *not* under arrest. (T. 17) The agent did not place handcuffs on Glover, only on Singletary (T. 18). Gourgues testified that if the defendants had attempted to leave,

he would have asked them to stay until he could finish his investigation. (T.20) The agent estimated the time that the handcuffs remained on Singletary was for approximately 15-20 minutes. (T. 21). He also conceded that he did not read Glover his (*Miranda*) rights (T. 13)  He was not asked during the hearing whether he had read Singletary his *Miranda* rights although it is alleged in the motion that the agent did not. (Rec. Doc. 10 at p. 2).

Agent Gourgues testified that, even after seizing the knives and patting down the defendants, he did not feel the scene was secure. He was concerned that there may be other individuals coming in from other camps or who were further up the trail from the location where he had confronted Glover and Singletary. Since there were multiple illegal baiting hunting areas in the subject area and the area was saturated with illegal activity, he wanted to be certain that he was alone because he had no back-up and very limited communications (only a cell phone).(T. 19, 28).  The area where the defendants were stopped was a "very heavily wooded area" where known illegal activities had been going on for three or four years and the activities occurring therein were the subject of an ongoing investigation. (T. 25) Agent Gourgues indicated he felt comfortable removing the handcuffs after a few minutes because he had removed the defendants cell phones, they had no 2-way radios which they could use to call other individuals hunting in the area, he had removed their knives and felt he had the situation under control. The time between handcuffing Singletary and removing the handcuffs was estimated by the agent to be about 15-20 minutes. (T.21). The agent explained that it took this amount of time because he had to question Singletary separately from Glover in order to compare their stories. However the agent indicated that the actions he took were all to insure his safety. (T. 22)

Agent Gourgues described the location where he had detained Singletary and Glover as very

remote, accessible only after a 45 minute drive to the boat ramp, a 15-20 minute motor boat ride, a 20 minute hike, a 3 minute pirogue ride across a small canal and then another 1/4 mile hike cross-country (no trails) to reach the area. The area is heavily wooded, with dense vegetation below the tree canopy. Gourgues was familiar with the baited area, having given it some 40-50 hours of surveillance before the morning when he confronted the defendants. (T. 26-28). The agent was alone in the area because only two agents with the U.S. Fish and Wildlife Refuge Division cover approximately 150,000 acres in Southeast Louisiana. (T. 27-28).

On cross-examination, Agent Gourgues explained that as part of his ongoing investigation of the subject area, on February 5, 2010,[1] he had removed the photo memory card out of an illegal remote trail camera stationed within the boundary of Bogue Chitto National Wildlife Refuge, near Charles Singletary's camp.[2] In the photographs from the memory card, Singletary and Glover are pictured adjacent to the illegal tripod corn feeder. Specifically, Exhibit G 3 shows Singletary in camouflage with a rifle, near the tripod feeder and Exhibit G 7 shows him with a shotgun or rifle slung over his shoulder. (T. 33-35; see also Government Exhibits G1-G7). The agent also reiterated that the area was so remote and the tree canopy so dense, a radio could not be used to call for help. (T. 38-39). He had sent a text message to his supervisor about an hour before meeting up with the defendants. (T. 39). Gourgues also explained that, after he removed the handcuffs from Singletary, he told Glover to take down the illegal tripod corn feeder, which Glover did. Singletary and Glover then walked to Singletary's camp while Gourgues operated the ATV. Glover assisted the agent with

---

[1]This date would be the day before Gourgues confronted the defendants in the clearing. (T. 34).

[2]The agent reported that he returned the memory card to the camera at approximately 4 am February 6th, 2010 so that his viewing of the photos would not be discovered. T. 45-46.

4

loading the tripod on the agent's boat, agreed to leave the keys in the ATV so the agent could come back for it and then the agent left the area.(T. 42-43).

ANALYSIS

Defendants Glover and Singletary have been charged in a five count bill of information for violations on a National Wildlife Refuge. Specifically, count 1 charges that they distributed bait or hunt over bait (corn and/or mineral blocks) on Bogue Chitto National Wildlife Refuge. Count 2 charges the defendants with illegal travel while using a motorized or other vehicle on other than a designated route of travel on Bogue Chitto National Wildlife Refuge. Count 3 charges both defendants with failure to remove a tree stand within the designated period of time, on the Bogue Chitto National Refuge. Count 4 charges Singletary only with possession of a controlled substance, marijuana, while on Bogue Chitto National Wildlife Refuge. Finally, Count 5 charges Singletary only with illegally clearing and cutting vegetation on the Bogue Chitto National Wildlife Refuge.

In the instant motion, defendants Glover and Singletary argue that the incriminating statements obtained by Agent Gourgues from them during the February 6th, 2010 incident related above, occurred during "custodial interrogation" and therefore warranted that the agent provide *Miranda*[3] warnings. Absent such warnings, the defendants argue, the statements should be suppressed. The government asserts that the detention of the defendants did not amount to a formal arrest or a significant restraint on their freedom to warrant *Miranda* warnings. Moreover, the government claims, the agent's safety concerns under the circumstances would justify the agent's actions.

---

[3]*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona*, ruled that police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, and that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *accord Dickerson v. United States*, 530 U.S. 428, 443-44(2000)(revisiting and reaffirming *Miranda*). The concept of "custodial interrogation" is thus central to the issue before the court.  *Miranda* warnings need not be given to "persons not under restraint.  General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected" by the *Miranda* decision. *Miranda*, 384 U.S. at 477, *Roberts v. U.S.*, 445 U.S. 552, 560-61 (1980).  *Miranda* also does not apply outside the context of the inherently coercive custodial interrogations for which it was designed. "The warnings protect persons who, exposed to such interrogation without the assistance of counsel, otherwise might be unable to make a free and informed choice to remain silent." *Roberts*,  445 U.S. at 560-61. The U.S. Fifth Circuit has stated that an individual's Fifth Amendment right against self-incrimination is implicated only during a "custodial" interrogation. *Murray v. Earle*, 405 F. 3d 278, 286 (5th Cir. 2005). Custodial interrogation occurs when police questioning is initiated after a person has been taken into custody. *Id.*  "A suspect is in custody for these purposes either (1) when he is formally arrested or (2) when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest." *Id.*  In deciding whether an individual was placed in custody, "[t]wo discreet inquiries are essential to the determination: first,

what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not a liberty to terminate the interrogation and leave.*" Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (focusing on a "totality of circumstances" test).

In this case, the government correctly asserts that neither defendant was under arrest. Specifically, the agent informed the defendants that they were not under arrest and no arrest of either of the defendants ever occurred.[4] The resolution of the question thus turns on whether the restraint on the defendant's movement was sufficient that a reasonable person in the defendants' position would associate the restraint with formal arrest. Here, the primary factors in favor of a finding that the defendants were "in custody" were that Singletary was placed in handcuffs for a short period of time (approximately 15-20 minutes) while the agent conducted his investigation and the officer was armed and, for less than a minute, the agent pointed his rifle at the defendants. The use of handcuffs as well as firearms certainly would reasonably make one feel restrained but not every handcuffing of a suspect transforms an investigation into a custodial interrogation. *See U.S. v. Fornia-Castillo*, 408 F.3d 52, 64 (1st Cir. 2005)(finding "reasonable safety concerns permeated the officer's decision to use handcuffs."). Moreover, law enforcement's use of firearms is not always related to taking a

---

[4]Counsel for Glover argued that the defendants were directed and controlled by Officer Gourgues for the entire time he was physically present with the defendants, including after the handcuffs were removed and the time when the three men walked to Singletary's camp. Review of the agent's testimony, however, indicates that the only direction given by the agent after arriving at Singletary's camp was relative to removing illegal tripod feeders or securing the illegally-used ATV, an appropriate exercise of Gourgue's authority as a U.S. Fish & Wildlife Service law enforcement agent. Otherwise, defendant Glover voluntarily waited until the agent could retrieve his boat and then assisted the agent in loading the feeder onto the boat. The agent also testified that the defendants freely engaged in conversation during this time with each other as well as with him. (T. 46-48).

7

suspect into custody. *See U.S. v. Bennett*, 329 F.3d 769, 774 (10th Cir. 2003)("Police may use firearms and handcuffs as part of a permissible detention when they reasonably believe it is necessary for their safety and protection.")

In the case at bar, although Agent Gourgues was armed with a rifle as well as a side arm, he did not employ those weapons in a coercive fashion. According to his testimony, he did not train the weapons upon the defendants for more than a minute and certainly not past the point where he felt that his own safety might be threatened. Agent Gourgues' use of the handcuffs on Singletary was during the time when he concerned for his safety. He used the handcuffs on one of the defendants at a time when he was not yet certain the area was secured. He removed the handcuffs within 15-20 minutes after gaining a fuller understanding of the security situation he was facing. He also specifically told the defendants that they were *not* under arrest. Although a police officer's subjective view whether an individual is in custody for purposes of *Miranda* normally has no bearing on the question, if the officer has conveyed his knowledge or belief regarding whether the individual is in custody or under arrest, then the officer's words or actions are relevant. *See Stansbury v. California*, 511 U.S. 318, 325 (1994). In this case, Officer Gourgues informing the defendants that they were not under arrest lessens the likelihood that any incriminating statements made by the defendants were coerced.

The agent's testimony at the hearing made it clear that his foremost concern was that he was alone with and outnumbered by two individuals who were being investigated for illegal baiting and hunting activity. One of the defendants were known to have recently carried long firearms. The location where the defendants were questioned is also not, in and of itself, one associated with law enforcement, such as a station house or a jail. Instead, the detention of these individuals occurred

in a location which is more sympathetic to the agent and his safety concerns. The agent confronted the defendants out in the woods in an extremely remote and difficult to access area. The agent knew that back-up assistance, if needed, would not be forthcoming for quite some time, and communications between the agent and other law enforcement officers or supervisors were severely limited. Until receiving some answers from the defendants pertaining to others who might be at the camp, the agent did not know how many individuals might potentially be out in the area or who might also come upon the scene. Additionally, the court has considered the fact that courts have been less likely to find a suspect was in custody if questioning takes place in surroundings familiar to the individuals detained. *See e.g., Beckwith v. U.S.*, 425 U.S. 341, 345-47 (1976)(Taxpayer interviewed at home did not require *Miranda* warnings); *U.S. v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007)(Defendant questioned by agents in their home; no *Miranda* requirement); *U.S. v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (*Miranda* warnings not required for defendant interrogated in a public place of her choosing and at her place of employment). The defendants, one of whom made camp in the area adjacent to where he was detained and was thus close to his home, were in a more advantageous position than the agent because they were familiar with that area and they alone knew what other individuals were in the area.

The "task of defining 'custody' is a slippery one." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). The court is aware that this is a close case. However, having assessed the totality of the circumstances involved, the court does not find that the defendant's were in custody so as to trigger the protections of *Miranda*.$^{5}$ The agent's testimony regarding the special security issues with which

---

$^{5}$The court is assuming, *arguendo*, that defendant Singletary has standing to raise the *Miranda* issue. No testimony was offered at the evidentiary hearing to affirmatively establish that Singletary was not given his *Miranda* rights. On the other hand, the agent testified that he

he was faced rings credible to the court and the agent's actions under the circumstances were not unduly coercive.  Accordingly,

The motion to suppress statements filed by defendants Charles Singletary and William Glover are hereby DENIED.[6]

New Orleans, Louisiana this 12th day of November, 2010.

LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE

Clerk to Notify Counsel

---

did not read defendant Glover his rights.